UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BRADFORD L. SHANKS,

                                                    Plaintiff,

                                                                        6:17-CV-00719
v.
                                                                        (DNH/TWD)

OTSEGO COUNTY NEW YORK, JUDGE BRIAN
D. BURNS, DISTRICT ATTORNEY JOHN MUEHL,

                                                    Defendants.
_____

APPEARANCES:

BRADFORD L. SHANKS
Plaintiff, pro se
12 Fonda Avenue
Oneonta, New York 13820

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**<u>ORDER AND REPORT-RECOMMENDATION</u>**

        The Clerk has sent to the Court for initial review the complaint in this 42 U.S.C. § 1983

civil rights action brought by Plaintiff Bradford L. Shanks against Defendants Otsego County,

the Hon. Brian D. Burns, Otsego County Court Judge, and Otsego County District Attorney

John Muehl.  (Dkt. No. 1.)  Also before the Court is Plaintiff's application for leave to proceed

*in forma pauperis* ("IFP Application").  (Dkt. No. 2.)

**I.      PLAINTIFF'S IFP APPLICATION**

        A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee

for commencing an action.  28 U.S.C. § 1915(a)(1) (2006).  After reviewing Plaintiff's IFP

Application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.  Therefore,

Plaintiff's IFP Application (Dkt. No. 2) is granted.

## II.    LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C.

§ 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the

case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii)

fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a

defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319,

325 (1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless

such as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437

(2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution

should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse

party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*,

700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is

not frivolous before permitting a plaintiff to proceed.  *See, e.g., Thomas v. Scully*, 943 F.2d 259,

260 (2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a

complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied*, 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).  A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.    COMPLAINT

Plaintiff's complaint consists solely of conclusory assertions that Defendants: (1) violated his rights under Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment to the United

States Constitution; (2) violated his rights under Articles One and Six of the New York State Constitution; and (3) are guilty of prosecutorial misconduct, false arrest, malicious prosecution, and abuse of process.  (Dkt. No. 1.)  There are no factual allegations in the complaint.  However, attached to Plaintiff's five page complaint are nearly 600 pages of exhibits related to the criminal matter out of which the lawsuit arises.  (Dkt. Nos. 1-1 through 1-5 and 1-7.)

### A.      Indictment, Arraignment, and Pre-Trial Proceedings

The Court has been able to glean from the exhibits to the complaint that on June 10, 2015, Plaintiff was indicted on one count of grand larceny in the third degree, a Class D felony (N.Y. Penal Law § 155.35(1)).  (Dkt. No. 1-1 at 7.[1])  According to the indictment, Plaintiff "on or about and between the 1st day of February 2010 and the 2nd day of December 2010 in the City of Oneonta, County of Otsego and State of New York, did steal property valued in excess of three thousand dollars ($3,000)."  *Id.*  The underlying facts supporting the indictment are that Plaintiff provided a false income tax return to Progressive Insurance Company falsely claiming that his 2008 income was approximately $38,000, when it had actually been $0, in order to receive lost wage benefits following a car accident.  *Id*. at 12, 35.

Plaintiff was arraigned before Judge Burns on June 25, 2015, in Otsego County Court. *Id*. at 9.  Otsego County District Attorney Muehl appeared on behalf of the People of the State of New York.  *Id*.  Bail was set at $10,000 cash or $20,000 surety bond.  *Id*. at 14.  The arraignment was formally completed before Judge Burns on September 25, 2015, with Plaintiff entering a plea of not guilty.  *Id*. at 20-21.  Although Plaintiff was represented by counsel at the

---

[1]     Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

arraignment, Judge Burns decided to assign new counsel because of a potential conflict of interest. *Id*. at 21-22. Pre-trial discovery ensued (Dkt. No. 1-1 at 31, 35), and Judge Burns denied counseled defense motions to dismiss the indictment and for recusal. *Id*. at 42-44, 68-70.

The grounds relied upon by Attorney David K. Taylor, Esq., one of Plaintiff's assigned counsel on the grand larceny charge, in the motion for dismissal of the indictment were that the People intended to rely at trial on evidence that was not presented to the grand jury. *Id*. at 26. Taylor also filed the motion requesting that Judge Burns recuse himself based on the notion of fundamental fairness and to avoid the appearance of impropriety. *Id.* at 51-52. The recusal request was based in part on the manner in which Judge Burns had handled Plaintiff's tardiness in court on July 10, 2015, by increasing bail in the amount of $5,000 cash or $10,000 bond and responding sarcastically when Plaintiff used the word "appointment" when asking if he could make his next court appearance in the afternoon.[2] *Id*. Recusal was also sought because when the District Attorney announced in open court on December 2, 2015, that he was going to move to dismiss the case, Judge Burns "expounded on a number of ways he could see that the case could still be successfully prosecuted." *Id*. at 52. The District Attorney subsequently decided to proceed with the prosecution. *Id.*

### B.    Trial

Plaintiff's jury trial on the grand larceny charge commenced on January 23, 2017, with Judge Burns presiding. (Dkt. No. 1-2 at 2.) District Attorney Muehl appeared for the People,

---

[2] According to defense counsel, Judge Burns responded "This is not an appointment Mr. Shanks. I don't cut hair or clean teeth. This is a court appearance on a felony that may incarcerate you if the are convicted for many years in the future." (Dkt. No. 1-1 at 53.)

and Attorney Dennis Laughlin appeared as Legal Advisor for Plaintiff.[3]  *Id.*  Judge Burns had

assigned Laughlin as legal advisor to Plaintiff in the criminal trial on January 20, 2017.  (Dkt.

No. 1-1 at 122.)  The Court noted at trial that Plaintiff had been represented by seven different

lawyers and had moved on to the eighth at the time of trial.  (Dkt. No. 1-2 at 6; *see also* Dkt. No.

1-1 at 70-74, 78-87, and 107-08.)  When Plaintiff told Judge Burns that he was not capable of

representing himself, the Judge explained to Plaintiff that was why Attorney Laughlin was

assigned to be his legal advisor.[4]  *Id.* at 9.

 Following deliberations, the jury found Plaintiff guilty on the third degree larceny

charge.  (Dkt. No. 1-3 at 81.)  Despite consent by Muehl to a continuation of Plaintiff' bail

pending sentencing, Judge Burns, expressing the belief that once convicted Plaintiff had become

a flight risk, remanded Plaintiff to the custody of the sheriff pending sentencing.  *Id.* at 87-88.

 Plaintiff thereafter filed three counseled post-conviction motions in the case.  (Dkt. Nos.

1-4, 1-5, and 1-7.)

---

[3]  Attorney Lee C. Hartjen, who had been relieved as Plaintiff's defense counsel, wrote to the Chief Clerk of the Otsego Supreme & County Court on January 17, 2017, advising him that Hartjen and another attorney, Mark Gordon, had met with Plaintiff and discussed with him the possibility of one of them sitting second seat at trial, not to represent him, but to give him any legal advice he might seek.  (Dkt. No. 1-1 at 119.)  According to Hartjen, Plaintiff informed both attorneys that he did not want them involved.  *Id.*

[4]  Judge Burns noted on the record that he had repeatedly told Plaintiff he should have legal counsel but that he had to work with counsel and could not yell at or bully them if they refused to take improper or frivolous actions at Plaintiff's request.  (Dkt. No. 1-2 at 9.)  The Court also noted that it was the fourth attempt at a jury trial in the case, and that the last three had been adjourned at Plaintiff's or his attorney's request when the attorney said he could not represent Plaintiff.  *Id*. 8-9.  The history of Plaintiff's representation legal representation on the grand larceny third degree charges is set forth in the transcript of the hearing on Hartjen's application to be relieved as Plaintiff's counsel on January 13, 2017, ten days before the commencement of trial.  (Dkt. No. 1-2 at 95-107.)  Judge Burns would not consent to another adjournment of the trial so that new counsel could be appointed for Plaintiff.  *Id.*

### C.     Post-Conviction Motions

#### 1.     Motion to Set Aside the Verdict and Dismiss the Indictment

On April 11, 2017, Plaintiff's post-conviction counsel Randel Scharf, Esq., filed a motion pursuant to N.Y. Criminal Procedure Law ("CPL") § 330.30(1) to set aside the jury verdict of guilty and dismiss the indictment due to the violation of Plaintiff's right to counsel; legal insufficiency of the evidence; and violation of constitutional rights including the right to counsel, right to a fair trial, right to due process, right to compulsory process, and right to confront witnesses against him.  (Dkt. No. 1-7 at 1.)  Scharf recited Plaintiff's difficult history regarding his frequent loss of defense counsel in the criminal matter and noted that Plaintiff had repeatedly and strenuously complained during trial that he was not competent to defend himself at trial by serving as his own defense counsel.  *Id*. at ¶¶ 30-78, ¶ 84.[5]  Judge Burns assigned stand by counsel, with whom Plaintiff had not met before trial, to assist him in the criminal trial even though Plaintiff had never requested to act as his own counsel and had been forced to do so over his objection.  *Id*. at ¶¶ 78-79.  According to Scharf, Judge Burns failed to assess the ability of Plaintiff, who had a tenth grade education and only one eye, to serve as his own defense counsel, and failed as well to solicit a knowing, intelligent, voluntary waiver of Plaintiff's right to counsel.  *Id*. at ¶ 77.

Scharf claimed that Judge Burns repeatedly humiliated and degraded Plaintiff in front of prospective jurors and told them that Plaintiff had refused to cooperate with his attorneys and, as a result, was at trial with only a legal advisor despite having been given numerous opportunities

---

[5]  Paragraph numbers are used where documents identified by CM/ECF docket number contain consecutively numbered paragraphs.

to be represented by counsel.  *Id.* at ¶¶ 87-89.  Scharf described Judge Burns as having made misstatements and given disinformation to the jury with regard to Plaintiff's purported unwillingness to cooperate with his counsel.  *Id*. at ¶ 90.  According to Scharf, two of Plaintiff's attorneys had been relieved for conflicts, one fell seriously ill, one relocated to Atlanta, and two lawyers quit and lied about Plaintiff.  *Id*.  Scharf argued that Judge Burns' statement to the jury that "we are now on number eight" was misplaced, inaccurate and outrageous, and that Judge Burns should have assigned Plaintiff new counsel for trial.  *Id*. at ¶¶ 94, 98.

The other issues raised by Scharf in the motion included the trial court's alleged interference with Plaintiff's right to compulsory process with respect to an IRS witness he wished to call; impermissible burden shifting in the court's preliminary instruction; failed *Rosario* turnover by Muehl; testimony of witnesses, including the impermissible trial testimony of Plaintiff's wife; Muehl's trial summation, including, *inter alia*, making repeated unfair and prejudicial comments, testifying to the jury in summation, engaging in disingenuous conduct, and vouching for the credibility of his own witnesses; and Judge Burns' charge to the jury, including, *inter alia*, an improper instruction regarding the fact that Plaintiff did not testify.  *Id.* at ¶¶ 164-221.

### 2.    Motion for Reconsideration of the Motion to Dismiss the Indictment

On or about April 6, 2017, Scharf filed a motion on Plaintiff's behalf seeking reconsideration of Judge Burn's denial of his initial motion to dismiss the indictment.  (Dkt. No. 1-4.)  Scharf argued that the indictment was defective because it failed to assert facts supporting every element of the offense charged and defendant's commission thereof with sufficient precision to clearly apprise the defendant of the conduct which was the subject of the accusation

as required by CPL § 210.25.  *Id*. at 3.  Scharf also argued that the bill of particulars was

inadequate to flesh out the defective indictment.  *Id*. at 8.  In addition, Scharf asked Judge Burns

to consider whether the grand larceny charge was time-barred.  *Id*. at 5-6.

>                3.      Motion for Reconsideration of the Motion to Recuse

In April 2017, Scharf also filed a motion on Plaintiff's behalf for reconsideration of the

previously denied recusal motion.  (Dkt. No. 1-5.)  The motion dealt largely with Plaintiff's

having been required by Judge Burns to defend himself at trial against his will and with only a

legal advisor because he had been represented on the indictment by so many attorneys.  *Id*.  As

in the post-trial motion, Scharf argued on Plaintiff's behalf that Judge Burns had misrepresented

to the jury that Plaintiff's conduct was responsible for his having had so many lawyers when, in

fact, lawyers had been excused from representation for many different reasons, the majority of

which had nothing to do with Plaintiff's conduct.  *Id*. at ¶¶ 35-70.  Scharf's other arguments

generally echoed those made in Plaintiff's post-trial motion under CPL § 330.30(1) regarding

Judge Burns' claimed egregious mistreatment of Plaintiff during the trial in which he was forced

to represent himself.  *Id*. at ¶¶ 71-137

>        **D.      Resolution of the Criminal Matter**

While the post-trial motions were pending, Judge Burns held a conference with Muehl

and Scharf on April 21, 2017.  (Dkt. No. 1-3 at 119-129.)  At the conference, Muehl,

referencing a conference that had been held in the case, informed Judge Burns that he and

Scharf had discussed the issues raised at the conference and "in the interest of justice and to

bring finality to [the] matter, I have agreed and I believe the Court has agreed to accept my

recommendation at this point that if the defendant is to withdraw his current motions, the People

would recommend that the defendant be sentenced to time served – [a period of several months]." *Id*. at 120. Muehl told the court that a pending criminal possession of marijuana and what might be an aggravated unlicensed operation of a vehicle charge would also be covered by the agreement. *Id*. at 121-22.

Scharf informed the court that he had discussed the matter at length with Plaintiff, having seen him on nineteen separate occasions in the County jail, and Plaintiff was ready to go forward with the agreement as described by Muehl. *Id*. at 122. Plaintiff gave oral consent to the agreement at the conference, including withdrawing the three pending motions. *Id*. at 122-23. Judge Burns advised Plaintiff that his right to appeal his conviction and sentence would be waived as a part of the agreement. *Id*. at 125. Plaintiff stated that he understood, and he executed a waiver of his appeal rights. *Id*. Judge Burns accepted the agreement and informed Plaintiff he would be returned to the correctional facility and be released from custody. *Id*.

## IV.   ANALYSIS

### A.   Otsego County Court Judge Burns

As noted above, Plaintiff has alleged in his complaint that Judge Burns violated his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the Federal Constitution and Articles One and Six of the New York State Constitution. (Dkt. No. 1 at 2.) Plaintiff also claims that Judge Burns is guilty of abuse of power, malicious prosecution, false imprisonment, and racial discrimination. *Id*.

It is well-established that judges have absolute immunity from suit for acts performed in their judicial capacities. *Bradley v. Fisher*, 13 Wall 335, 80 U.S. 335 (1871); *accord, Mireles v. Waco*, 502 U.S. 9, 11 (1991) (per curiam) (holding that "judicial immunity is an immunity from

suit, not just from the ultimate assessment of damages") (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Immunity from suit is overcome in only two narrow circumstances. "First, a judge is not immune from liability for non-judicial actions, i.e., actions not taken in a judge's judicial capacity." *Mireles*, 502 U.S. at 11. "Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." *Id.*

The Supreme Court has "generally concluded that acts arising out of, or related to, individual cases before the judge are judicial in nature." *Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009), *aff'd*, 579 F.3d 204 (2d Cir. 2009). Judges enjoy absolute immunity even when a plaintiff offers allegations of "bad faith or malice." *Mireles*, 502 U.S. at 11. A judge cannot "be deprived of immunity because the action he took was in error . . . or was in excess of authority." *Id.* at 13 (quoting *Stump v. Sparkman*, 435 U.S. 349, 356 (1978)). The voluminous exhibits to Plaintiff's complaint show that his claim against Judge Burns is wholly related to the Judge's actions as the presiding judge in the criminal proceedings stemming from Plaintiff's indictment on the charge of grand larceny third degree. (See Dkt. No. 1-1 through 1-5 and 1-7.) Therefore, as long as he was acting within the jurisdiction of a County Court judge in New York State Judge Burns has absolute immunity from suit for the actions complained of by Plaintiff.

County Courts in New York State are courts of limited jurisdiction that may exercise only such powers as are conferred by statute. *See* N.Y. Constitution, Art. 6, § 11. Pursuant to CPL § 10.10(2), County Court falls within the category of "Superior Court." Superior Courts have trial jurisdiction over felonies, misdemeanors, and petty offenses and have discretion to sit as local criminal courts for the purpose of conducting arraignments. *See* CPL §§ 10.20(1) & (3). Thus, Judge Burns, as Otsego County Judge, was acting within the jurisdiction granted County

Courts in the State of New York with regard to the claims asserted by Plaintiff.[6]

Based upon the foregoing, the Court finds that Judge Burns is entitled to judicial immunity and recommends that the complaint be dismissed as against him with prejudice on absolute immunity grounds.

### B.    Otsego County District Attorney Muehl

In addition to the same claims asserted against Judge Burns, Plaintiff has asserted a claim for prosecutorial misconduct against District Attorney Muehl.  (Dkt. No. 1 at 2, 4.) "Because a public prosecutor cannot zealously perform the prosecutorial duties of the office if compelled to work under the constant threat of legal reprisals, such official is shielded from liability for civil wrongs by the doctrine of absolute immunity."[7]  *Hill v. City of New York*, 45 F.3d 653, 656 (2d Cir. 1995).  The Second Circuit explained in *Hill*, *id*. at 660-61, that:

> In determining whether absolute immunity obtains, we apply a "functional approach," looking at the function being performed rather than to the office or identity of the defendant.  *See Buckley v. Fitzsimmons*, 509 U.S. 259, 268-69 (1993).  State prosecutors are entitled to absolute immunity for that conduct "intimately associated with the judicial phase of the criminal process."  *Imbler* [*v. Pachtman*, 424 U.S. 409, 430 (1976)].  Thus, a district attorney is absolutely immune from civil liability for initiating a prosecution and presenting the case at trial.  *Id*. at 430-31; *Buckley*, 509 U.S. at 273.  Such official is also immune for conduct in preparing for those functions; for example, evaluating and organizing evidence for presentation at trial or to a grand jury, *Buckley*, 509 U.S. at 273, or determining which offenses are to be

---

[6]  Since Plaintiff was indicted by an Otsego County grand jury for a crime that allegedly occurred in Otsego County (Dkt. No. 1-1 at 7), Otsego County Judge Burns had geographical jurisdiction in addition to subject matter jurisdiction.  *See* N.Y. Constitution, Art. 6, §11.

[7]  A district attorney in New York State is also entitled to Eleventh Amendment immunity when involved in prosecuting a criminal matter.  *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 536 (2d Cir. 1993).

> charged.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522,
> 530 (2d Cir. 1993).  Prosecutorial immunity from § 1983 liability
> is broadly defined, covering "virtually all acts, regardless of
> motivation, associated with [the prosecutor's] function as an
> advocate."  *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994).

Absolute immunity does not extend to a prosecutor's investigative or administrative acts.

*Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976).  A prosecutor is insulated by immunity

from liability where his actions directly concern the pre-trial or trial phases of a case, even when

the prosecutor is alleged to have engaged in such conduct as falsification of evidence, coercion

of witnesses, solicitation or subornation of perjured testimony, withholding of evidence, or

relying on illegally seized evidence at trial.  *Taylor v. Kavanagh*, 640 F.2d 450, 452 (2d Cir.

1981); *see also Araguaya v. United States*, No. 00 CV 1203 (C.A.), 2005 WL 1263291, at *2

(E.D.N.Y. May 27, 2005)[8] ("It is settled law that when a prosecutor presents evidence to a grand

jury and at trial he is acting as an advocate and entitled to absolute immunity on claims that the

evidence presented was false."); *Jones v. City of New York*, 988 F.Supp. 2d 305, 312 (E.D.N.Y.

2013) (decisions about investigation, disclosure and use of information, and to continue

prosecuting plaintiff "were exercises of legal judgment undertaken in preparation for trial.")

The exhibits to Plaintiff's complaint contain nothing suggesting that his claims against

Muehl fall outside of the initiation of the criminal prosecution by presenting the charge ot the

grand jury, pre-trial proceedings, presentation of the case at trial, and dealing with post-trial

matters.  *See Imbler*, 424 U.S. at 430-31; *Buckley v. Fitzsimmons,* 509 U.S. 259, 268-69 2000.

Therefore, the Court finds that Muehl is entitled to absolute prosecutorial immunity with regard

---

[8] Copies of all unpublished decisions cited herein will be provided to Plaintiff in
accordance with *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

to Plaintiff's claims against him and recommends that the complaint be dismissed as against him with prejudice on absolute immunity grounds.

### C.    Otsego County

Plaintiff has alleged in his complaint that Otsego County is the employer of Muehl and Judge Burns (Dkt. No. 1 at 4), and he appears to be suing the County in a supervisory capacity. *Id.* Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. 658); *see also Walker v. City of New York,* 974 F.2d 293, 296 (2d Cir. 1992) ("it is only when the municipality itself commits the misdeed, that is, when the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent the official policy, inflicts the injury that the government as an entity is responsible under § 1983.") (quoting *Monell*, 436 U.S. at 690-91).

A municipality may be liable for deprivation of constitutional rights under § 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989). To establish causation, there must "at the very least be an affirmative link between the policy and the particular constitutional violation alleged." *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985).

14

1.    Liability for Claims Against District Attorney Muehl

"In this Circuit, a county may be liable pursuant to § 1983 for the actions of the district

attorney in limited circumstances."  *Miller v. County of Nassau*, 467 F.Supp. 2d 308, 314

(E.D.N.Y. 2006) (internal citation and quotation marks omitted).  "When prosecuting a criminal

matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the

State not the county."  *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988).  "[T]he district

attorney, and the district attorney alone, should decide when and in what manner to prosecute a

suspected offender . . . .  No County policy can require them to act otherwise."  *Id*.  "A county

has no right to establish a policy concerning how [the district attorney] should prosecute

violations of State penal laws." *Id*.  Accordingly, a district attorney's misconduct in prosecuting

an individual cannot give rise to municipal liability.  *See Walker*, 974 F.2d at 301 (citing *Baez*,

853 F.2d at 77).

It is only where claims center on the administration or management of the district

attorney's office that a district attorney may be found to have acted as a policymaker for

purposes of § 1983 liability.  *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir.

1993); *Walker*, 974 F.2d at 301 ("Where a district attorney acts as the manager of the district

attorney's office, the district attorney acts as a county policymaker.")

The exhibits to Plaintiff's complaint show that the claims he is asserting against Muehl

all involve actions taken by him in connection with the prosecution of the grand larceny charge,

rather than administrative capacity.  Therefore, the Court finds that Plaintiff has failed to state a

Plaintiff's § 1983 claim against Otsego County with regard to the actions of Muehl, and

recommends that the claim be dismissed with prejudice because the problem with Plaintiff's claim against the County cannot be cured by a better pleading. *See Cuoco*, 222 F.3d at 112.

### 2.    Liability for Claims Against Judge Burns

Plaintiff has alleged in his complaint that Judge Burns is an employee of Otsego County. (Dkt. No. 1 at 4.)  County Court judges are not employed by the County in which they sit.  The New York State Constitution was amended, effective September 1, 1962, to require a unified court system for the state with the Surrogate, Family, and County Courts being designated as statewide courts.  N.Y. Const., Art. VI, § 1.  Article VI, § 1 vests the judicial authority of the State in the unified court system.  *Id.*  Judges of those courts and others in the unified court system became employees of the unified court system on April 1, 1977.  *See Weissman v. Evans*, 452 N.Y.S.2d 864, 865 (1982); N.Y. Judiciary Law § 220 (making compensation of judges a state charge).

District courts in the Second Circuit have followed case law from other circuits in determining that "municipal judges do not act as policy makers and therefore a municipality cannot be liable under *Monell* for a Section 1983 claim based solely on the actions of its judges." *Bliven,* 478 F.Supp. 2d at 337 & n.2 (citing decisions from the Fifth, Seventh, Eighth, Ninth, and Tenth Circuits).  The district court in *Bliven* also determined that "Family Court judges . . . are not municipal employees; they are State employees.  Defendant [County] does not train or supervise these employees and therefore, cannot be held liable for any alleged failure to train and supervise." *Id.*, 478 F.Supp. 2d at 340.  Since County Courts are also part of the unified court system, the same holds true in this case.

Based upon the foregoing, the Court finds that Plaintiff has failed to state a claim under

§ 1983 against the County of Otsego with regard to the actions of Judge Burns and recommends

that the claim be dismissed with prejudice because the problem with Plaintiff's claim against the

County cannot be cured by a better pleading.  *See Cuoco*, 222 F.3d at 112.

ACCORDINGLY, it is hereby

ORDERED, that Plaintiff's IFP Application is GRANTED; and it is

RECOMMENDED that Plaintiff's complaint (Dkt. No. 1) be DISMISSED WITH

PREJUDICE for failure to state a claim upon initial review under 28 U.S.C. § 1915(e)(2)(B)(i)-

(iii); and it is hereby

ORDERED that the Clerk provide Plaintiff with a copy of this Order and Report-

Recommendation, along with a copy of the unpublished decision in *Araguaya v. United States*,

No. 00 CV 1203 (C.A.), 2005 WL 1263291 (E.D.N.Y. May 27, 2005) in accordance with the

Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file

written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

_____

[9]  If you are proceeding pro se and are served with this Order and Report-
Recommendation by mail, three additional days will be added to the fourteen-day period,
meaning that you have seventeen days from the date the Order and Report-Recommendation
was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that
prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended
until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ.
6(a)(1)(C).

636(b)(1); Fed. R. Civ. P. 72.

Dated:  July 17, 2017
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

KeyCite Yellow Flag - Negative Treatment
Distinguished by Henry v. Milonas, N.Y., February 24, 1998

**56 N.Y.2d 458**
**Court of Appeals of New York.**

Morton WEISSMAN et al., Individually and on
Behalf of All Present and Future Judges of Suffolk
County District Court, Respondents-Appellants,

v.

Herbert EVANS, as Administrative Judge
and Chief Administrator of the Courts of the
State of New York, and as Representative
of the Administrative Board of the Judicial
Conference of the State of New York, et al.,
Appellants-Respondents, et al., Defendant.

July 2, 1982.

County district judges sought declaratory judgment
entitling them to salary equal to that of other such judges
in adjoining county. The Supreme Court, Special Term,
Westchester County, Leonard Rubenfeld, J., directed
that appropriate steps be taken to end salary disparity,
effective October 1, 1980, and, on appeal, the Supreme
Court, Appellate Division, changed effective, date to April
1, 1982, 82 A.D.2d 441, 442 N.Y.S.2d 80. Cross appeals
were taken. The Court of Appeals, Fuchsberg, J., held
that: (1) wage disparity between plaintiff judges and judges
of adjoining counties represented an unconstitutional
impairment of plaintiffs' rights to equal protection of laws,
and (2) appropriate date from which to measure accrual of
plaintiffs' rights was on date to which relevant legislation
was retroactively effective.

Modified and affirmed.

West Headnotes (4)

**[1]** **Constitutional Law**
👉 Territorial Uniformity;Application to
Places, Areas, or Regions

While equal protection does not necessarily
require territorial uniformity, a territorial
distinction which has no rational basis

will not support a state statute.
U.S.C.A.Const.Amend. 14; Const.Art. 1, § 11.

1 Cases that cite this headnote

**[2]** **Constitutional Law**
👉 Territorial Uniformity;Application to
Places, Areas, or Regions

**Constitutional Law**
👉 Rational Basis Standard;
Reasonableness

To meet test of rationality employed
in determining whether a statute setting
forth territorial distinctions violates equal
protection, it must appear that there is
some ground of difference having a fair and
substantial relation to object of the legislation.
U.S.C.A.Const.Amend. 14; Const.Art. 1, § 11.

8 Cases that cite this headnote

**[3]** **Constitutional Law**
👉 Compensation, Pensions, and Benefits

**Judges**
👉 Constitutional and Statutory Provisions

Wage disparity between district court
judges of adjacent counties represented
an unconstitutional impairment of equal
protection as there was no rational
basis for geographic classification on
which the wage disparity was founded.
U.S.C.A.Const.Amend. 14; Const.Art. 1, § 11;
McKinney's Judiciary Law § 39, subd. 6.

21 Cases that cite this headnote

**[4]** **Judges**
👉 Amount

District court judges who established their
right to salary differential were entitled to
payment of the differential from date relevant
legislation had been made retroactive.

4 Cases that cite this headnote

438 N.E.2d 397, 452 N.Y.S.2d 864

**Attorneys and Law Firms**

**\*459 \*\*\*864 \*\*397** Robert Abrams, Atty. Gen. (Jeffrey I. Slonim, Asst. Atty. Gen., and Shirley Adelson Siegel, Sol. Gen., of counsel), for appellants-respondents.

Frederic Block, Smithtown, for respondents-appellants.

**\*460** Murray A. Gordon and Richard Imbrogno, New York City, for Willard W. Cass, Jr., and others, amici curiae.

OPINION OF THE COURT

FUCHSBERG, Judge.

The plaintiffs, District Court Judges of the Suffolk District Court, seek among other things, a judgment declaring the perpetuation of an unfavorable salary disparity between **\*461** the plaintiffs and the Judges of the only other District Court in the State, that of adjoining Nassau County, violative of the equal protection provisions of our Federal and State Constitutions. [1] As a supplementary **\*\*\*865 \*\*398** item of relief plaintiffs also sought a judgment covering the resulting unconstitutional salary differential commencing with April 1, 1977, the date the Judges became employees of the State's unified court system. [2] Named as defendant were the State, its Comptroller, the Chief Administrator of the Courts (both in this capacity and as the representative of the Administrative Board of the Judicial Conference) and the County of Suffolk.

The parties having stipulated that the facts were not in dispute, on a motion for summary judgment Supreme Court, Westchester County, sitting at Special Term, found merit in the constitutional claim and, in a judgment dated July 29, 1980, though it dismissed the complaint against the county, declared that the plaintiffs' right to equal protection will have been violated unless the other defendants (hereinafter "the State") took "all appropriate steps to end the salary disparity" prior to October 1, 1980. On cross appeals to the Appellate Division, Second Department, the State directed its attention to the declaration on constitutionality of the salary differential, while the plaintiffs addressed only the correctness of so much of the judgment as allowed the disparity to continue until October 1, 1980. The Appellate Division, 82 A.D.2d

441, 442 N.Y.S.2d 80, applying the rational basis test, as had the Supreme Court, and agreeing that the case presented a potential constitutional violation, modified the judgment by substituting April 1, 1982 for October 1, 1980 as the target date for elimination of the disparity and otherwise affirmed.

On cross appeals to this court, the State challenges the now modified declaration on constitutionality, while the plaintiff Judges confine themselves to "the issue of the **\*462** appropriate starting date on which plaintiffs were entitled to receive parity with the Judges of the District Court of Nassau County". For the reasons which follow, we find that the wage disparity represents an unconstitutional impairment of the plaintiffs' right to equal protection of the laws and that, by way of ancillary relief, the plaintiffs are entitled to judgment for the differentials which were their due since October 1, 1978.

A pivotal point in the events which led to this litigation was the enactment of the unified court budget act, which, to implement the State's takeover of the courts, provided that judicial personnel were henceforth State employees and that, concordantly, they would be placed on the State payroll on April 1, 1977 (Judiciary Law, § 39, subd. 6 [L.1976, ch. 966, § 2]).

This abolished the prior system, in which, in many instances, the salaries of Judges, including those in both the Suffolk and Nassau District Courts (L.1962, chs. 35, 811), were determined and financed in part by localities. The implications of the change so effected were not left to imagination. As the preamble to the statute put it, "It is both uneconomical and inefficient to have the responsibility of funding this state-operated court system divided among various units of local government. This divided funding blurs responsibility and accountability for an effective court system and makes the operation of each of the state courts dependent upon varying fiscal capabilities of individual local governments \* \* \* Funding by a single fiscal authority will enable the allocation of moneys and manpower when needed *unimpeded by artificial local boundaries* and the diverse competing needs of local governmental agencies" (L.1976, ch. 966, § 1 [emphasis added] ).

Nonetheless, the act suffered existing disparities by a temporally open-ended provision that "salaries [of District Court Judges] \* \* \* shall continue in effect until

altered by state law" ( ***866 **399 Judiciary Law, § 39, subd. 6, par. [a] (L.1976, ch. 966, § 2] ).[3] Thus, no attempt was then made actually to *463 eliminate discrepant financial treatment attributable solely to local government discretion and funding, precisely the kind of nonuniformity it was the avowed purpose of the act to remove.

Over two years later, when, by passing section 221–f of the Judiciary Law (L.1979, ch. 55), the Legislature finally did get around to establishing its own salary scales for its newly absorbed District Court Judges, it still chose to maintain rather than to eliminate the disparity.[4] This though on December 1, 1979, years after the State takeover, Judge Herbert Evans, Chief Administrator of the Courts, under legislative mandate that he "investigate whether unreasonable disparity exists in the compensation of judges of courts of the same rank in different parts of the state" (L.1979, ch. 55, § 4), reported to the Legislature, to the Governor and to the Chief Judge that continuation of disparity in the courts was "neither necessary, desirable nor equitable" and, with specific regard to the District Courts in Nassau and Suffolk, recommended that their salaries be equalized. Now at the six-year stage, this advice is yet to be heeded.

This long tolerance of the discrepancy cannot be ascribed to any doubt about the accuracy of Judge Evans' appraisal. For the facts plaintiffs proffered at nisi prius and the defendants did not there contest—and which neither court below found any reason in law to question—included expert appraisals that the two counties, which for many years have formed the State's Tenth Judicial District, constitute a "true unity of * * * judicial interest * * * indistinguishable by separate geographic considerations"; that the jurisdiction, practice and procedures of each of the District Courts and the functions, duties and responsibilities of their Judges are identical (see Uniform District Court Act); and, that, for practical purposes, as Judicial Conference data certify, their caseloads are substantially the same.

*464 Indeed, lacking adequate explanation for the long delay in eliminating the disparity, the State, as in the lower courts, is now reduced to reiteration of its position that the territorial distinction, coupled with the history of the inequality practiced by the respective counties in years gone by, interdicts an equal protection claim.

It seems to us that the historical differential, in this case at least, cannot serve as a foundation for such an argument. The history to which it alludes almost inevitably was occasioned by the discordant results which were bound to flow from the discredited funding practice which permitted each county to go its own way. But, however intrenched the local influence at one time may have been, it had begun to lose its *raison d'etre* at least as early as 1962, when the State Constitution first prescribed a unified State-wide court system (N.Y.Const., art. VI, § 1, subd. a). Its demise obviously had become more imminent by 1972, when a legislative commission reported that "differential treatment within a given court level may be an obstacle to such unification" (Report on Compensation of New York State Legislators and Judges, April 30, 1972, State Commission on Legislative and Judicial Salaries, p. 30) and, needless to say, when, in the year before its April 1, 1977 effective date, the preamble to the unified court budget act spoke to the importance of the unified system's fiscal authority being "unimpeded by artificial local boundaries", the State must be deemed to have dealt the *coup de grace* to any remaining vestiges of the policy defendants' brief would now resurrect. In fine, if anything, unless ancient rather than ***867 **400 recent history is resorted to, a study of the past proclaims the proposition that the State has for a considerable number of years come to view differential treatment within a given court level as an irrational rather than a rational way to further the public interest.

[I]    Little more can be said for the other prop on which the State posits its equal protection analysis, i.e., that, even absent rational bases, geographical distinctions must survive an equal protection attack so long as they "are not based on constitutionally prescribed categories, such as race". Authoritatively stated, however, the rule is that, while equal protection does not necessarily require territorial *465 uniformity (see Salsburg v. Maryland, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 [pre-*Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 case, permitting State to use illegally obtained evidence in one highly urbanized part of Maryland where there was an unusually high incidence of gambling]; *Matter of Rosenthal v. Hartnett*, 36 N.Y.2d 269, 272–273, 367 N.Y.S.2d 247, 326 N.E.2d 811 ["volume of traffic" and criminal court congestion in the larger cities of this State justify an "administrative rather than a judicial standard of proof" in the adjudication of traffic infractions in cities with populations of a million or more] ), "[a] territorial

distinction which has no rational basis will not support a state statute" (*Manes v. Goldin*, 400 F.Supp. 23, 29 [three-Judge court], affd. 423 U.S. 1068, 96 S.Ct. 851, 47 L.Ed.2d 80 [charging of court fees]; *Commissioner of Public Welfare of City of N. Y. [Martinez] v. Torres*, 263 App.Div. 19, 31 N.Y.S.2d 101 [corroboration required for paternity proceedings in New York City, but not elsewhere] ).

Under this rule, analysis of *Matter of Hogan v. Rosenberg*, 24 N.Y.2d 207, 299 N.Y.S.2d 424, 247 N.E.2d 260, revd *sub nom. Baldwin v. New York*, 399 U.S. 66, 90 S.Ct. 1886, 26 L.Ed.2d 437, on which the defense places heavy reliance, undermines rather than supports its contrary position. For in *Hogan*, our court upheld the constitutionality of a law which limited jury trial in New York City to crimes punishable by more than one year in prison. In doing so, it took the pains to point out that "the overburdening caseload existing in the criminal courts of the highly populated City of New York has given rise to extraordinary and unique circumstances which manifests the reasonable basis for making such a distinction" (*supra*, at p. 218, 299 N.Y.S.2d 424, 247 N.E.2d 260).

[2]    What this all adds up to is that, " '[w]hile distinctions based on geographical areas are not, in and of themselves, violative of the Fourteenth Amendment * * * a state must demonstrate * * * that the classification is neither capricious nor arbitrary but rests upon some reasonable consideration of difference or policy' " (*Levy v. Parker*, 346 F.Supp. 897, 902 [three-Judge court], affd. 411 U.S. 978, 93 S.Ct. 2266, 36 L.Ed.2d 955). Stated differently, to meet the test of rationality, which all courts and parties here have agreed is appropriate to this case, it must appear that there is "some ground of difference having a fair and substantial relation to the object of the legislation" (*Manes v. Goldin*, 400 F.Supp. 23, 29, affd. 423 U.S. 1068, 96 S.Ct. 851, 47 L.Ed.2d 80, *supra* ).

**\*466** To measure the present case by these principles, we now turn to *Matter of Abrams v. Bronstein*, 33 N.Y.2d 488, 492, 354 N.Y.S.2d 926, 310 N.E.2d 528, an equal protection case arising out of a compensation dispute, where the following test was suggested: after ascertaining "the basis of the classification involved and the governmental objective purportedly advanced * * * [t]he classification must then be compared to the objective to determine whether the classification rests 'upon some ground of difference having a fair and substantial relation'

to the object for which it is proposed (*Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 * * *)."

[3]    So viewed, there is no rational basis for the geographic classification on which the State leans to support its defense of the disparate judicial salaries. That the two separate counties compensated their District Court Judges differently (not then **\*\*\*868** **\*\*401** subject to equal protection analysis), whatever the asserted justification for that difference, is immaterial to consideration of the claim that there is no warrant for differentiation by the now single employer, the State of New York.[5] Far from advancing a legitimate State objective, a different approach would directly contravene the long-heralded and legislatively indorsed substitution of State for local control of the courts. On the undisputed record, since the disparate treatment of the District Courts of Nassau and Suffolk Counties has now long been without rational foundation, there is no choice but to declare it offensive to the plaintiffs' constitutionally protected right to equal protection of the laws of this State.

Finally, having so decided, we turn to the matter of the date as of which it is appropriate that the obligation to pay the Suffolk County District Judges the differential between the salaries they have been receiving and those paid to their counterparts in Nassau County should be computed. The submission filed on behalf of the plaintiffs, realistically recognizing that a "brief and temporary disparity in salaries incidental to the unification of the courts" would not be unprecedented (*Alesi v. Procaccino*, 47 A.D.2d 887, 367 N.Y.S.2d 24 [nine-month delay] ), suggested an outside date would be October 1, 1978.

In our own consideration, we start with fixed landmarks. One is the fact that approximately six years have now elapsed since the adoption of the uniform court budget act (L.1976, ch. 966) and that over half a decade has gone by since April 1, 1977, the date on which, in accordance with the act, the State assumed responsibility for the plaintiffs' salaries. A second is that a related obligation to classify and so eliminate disparities among the unified court system's nonjudicial employees was honored without event as of April 1, 1978 (L.1979, chs. 309, 311).

But puzzling is the legislative failure to have acted on this subject when, in 1979, it finally focused on the salaries of the District Court Judges. It appears to us that, since the Legislature then found the time to fix salaries, even

retroactively to October 1, 1978, it surely was presented with the occasion to see to it that, in the process, the parity required by the Constitution was achieved. Had it so acted, the unconstitutional differential between the Nassau and Suffolk Judges would have been rectified as of the retroactive date set by the Legislature for the action it did take.

 [4]   This leads quite logically to the conclusion that fixing October 1, 1978 as the date from which to measure the accrual of plaintiffs' rights would accord with simple equity and fairness. This is particularly so since deferral to a later date would not merely lessen the relief for many plaintiffs, but, in whole or in part, would vitiate it for those who retired on or after the designated date, with corresponding exclusion of parity from their pension bases (see Judiciary Law, § 39, subd. 9, par. [a]; Retirement & Social Security Law, § 2, subds. 2, 9; § 75, subd. a, pars. 3, 4). A later date would also be an unreasonable and undeserving departure from the long-recognized rule that a remedy should be coextensive with the wrong it is to redress (Wicker v. Hoppock, 6 Wall. [73 U.S.] 94, 99, 18 L.Ed. 752, quoted with approval in Albemarle Paper Co. v. Moody, 422 U.S. 405, 418–419, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280).

In sum, the order of the Appellate Division should be modified, with costs to the plaintiffs, insofar as it denied a *468 remedy prior to April 1, 1982 and the matter remitted to Special Term for the purpose of calculating the amount of salary due the plaintiffs from October 1, 1978, all in accordance with the writing herein and, as so modified, affirmed.


JASEN, JONES, WACHTLER and MEYER, JJ., concur with FUCHSBERG, J.

 ***869 **402  GABRIELLI, J., concurs in result only.

COOKE, C. J., taking no part.
Order modified, with costs to plaintiffs, and case remitted to Supreme Court, Westchester County, for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

**All Citations**

56 N.Y.2d 458, 438 N.E.2d 397, 452 N.Y.S.2d 864

Footnotes

1    (U.S.Const., 14th Amdt., § 1; N.Y.Const., art. I, § 11.)
2    The plaintiffs' complaint further alleged that monetary allowances in lieu of reimbursement for intercourt traveling expenses, a term of their employment prior to the date of court unification, should have been continued thereafter. However, Special Term having decided this issue adversely to the plaintiffs, they did not press it on appeal. We, therefore, have no occasion to pursue it here.
3    Ironically, because of separate provisions for the President Judge of each court, the President Judge of the Suffolk District Court receives greater compensation than his counterpart in Nassau County. Accordingly, as plaintiffs' brief advises, he was not joined as a party to this litigation.
4    The amici (Family Court, County Court and Surrogate Court Judges) claim they are similarly affected by this statute.
5    The State, without statistical or other support, suggests that Nassau had to pay its District Court Judges higher salaries than did Suffolk because the former's candidates were somewhat closer to the lure of private practice in New York City. But it is common knowledge that there has never been a paucity of candidates for the Bench of either county.

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.